IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| M.C. by her Next Friends and Plaintiffs | ) | |
| THOMAS and REBECCA CHIBNALL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No.  4:25-cv-1482 |
| v. | ) | |
| | ) | |
| SPECIAL SCHOOL DISTRICT | ) | |
| OF ST. LOUIS COUNTY and | ) | JURY TRIAL DEMANDED |
| WEBSTER GROVES | ) | |
| SCHOOL DISTRICT | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs M.C. (Student), by her parents, Rebecca Chibnall (Mother) and Thomas Chibnall (Father) (collectively Parents), and Parents pray for reversal of a special education decision of the Missouri Administrative Hearing Commission pursuant to the Individuals with Disabilities in Education Act, 20 U.S.C. § 1415(i)(2)(A), and for relief for disability discrimination pursuant to Section 504, Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and the Americans with Disabilities Act (ADA), 42 U.S.C. 12131 *et seq.*

## PARTIES

1.     Plaintiff M.C. (Student) is a nine-year-old female enrolled in the fifth grade at the Churchill School. She has medical diagnoses of Attention Deficit Hyperactivity Disorder (ADHD), anxiety, and Specific Learning Disabilities (SLD) in Basic Reading,

Reading Fluency, and Math Fluency. Plaintiff M.C. is a resident of St. Louis County, Missouri.

2.    Plaintiffs Rebecca and Thomas Chibnall, M.C.'s parents and Next Friends (Parents), are residents of St. Louis County and active participants in M.C.'s education and rearing. Parents are residents of St. Louis County, Missouri, and reside with M.C.

3.    Defendant Webster Groves School District (WGSD) provides M.C. general education and teaches a general curriculum, including skills such as reading, writing, and math. Defendant WGSD's principal place of business is in St. Louis County, State of Missouri, and subject to Federal and state law and regulations, including by the U.S. Department of Education.

4.    Defendant Special School District of St. Louis County (SSD) declined to provide M.C. special education services. Defendant SSD's principal place of business is in St. Louis County, State of Missouri, and subject to Federal and state law and regulations, including by the U.S. Department of Education.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction pursuant to 20 U.S.C. § 1415(i)(2)(A) of the Individuals with Disabilities Education Act (IDEA), 29 U.S.C. § 794(a), 42 U.S.C. §§ 12131-12165, and 28 U.S.C. § 1331. It has supplemental jurisdiction over related state claims pursuant to 28 U.S. Code § 1367(a).

6.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 in that all parties reside or conduct business in this district and all events described in this Complaint occurred within the Eastern District of Missouri. Declaratory relief is authorized by 28 U.S.C. §§ 2201, 2202.

7.     On June 11, 2025, Plaintiffs filed a due process petition before the Missouri Administrative Hearing Commission (AHC), exhausting administrative remedies. The AHC dismissed the petition on August 19, 2025.

8.     Plaintiffs previously filed a due process petition in September 2024; the AHC issued its ruling in that case on December 11, 2024, and Plaintiffs' appeal of that decision is pending before this Court in case no. 4:25-CV-00095-JSD.

## STATEMENT OF FACTS

### Former Due Process Complaint and Pending Appeal

9.     In September 2024, Plaintiffs filed a due process complaint alleging violations of the Individuals with Disabilities in Education Act (IDEA); specifically, they alleged Defendants failed to evaluate and find M.C. eligible for special education services and requested reimbursement for private placement and private tutoring, as well as an Individualized Education Plan (IEP) while M.C. was a student at Respondent WGSD.

10.     The AHC held a hearing on the complaint in October and November of 2024.

11.     On December 11, 2024, the AHC issued its decision, ruling that Plaintiffs failed to prove a violation of IDEA in *Thomas and Rebecca Chibnall, in the interest of M.C. v. Webster Groves Sch. Dist. and Special Sch. Dist. of St. Louis County*, No. 24-1208 (Dec. 11, 2024). As noted above, an appeal of that administrative decision is pending in this court. 4:25-CV-00095-JSD.

3

## <u>Background: Kindergarten to Third Grade (2020-2024)</u>

12.     Plaintiff M.C. began kindergarten in 2020, and Parents quickly developed concerns with her reading, speech, and language.

13.     Shortly after entering first grade, a dyslexia screener indicated concerns in phonics, reading comprehension, and spelling, and WGSD referred M.C. for reading intervention.

14.     By mid-year, WGSD determined that by their metrics, M.C.'s reading ability had improved enough to remove her from reading intervention; however, her teacher and parents still harbored concerns, and the end-of-year dyslexia screener continued to show her as at "some risk" in phonics and reading comprehension and "high risk" in spelling.

15.     M.C. spent all of second grade in math intervention; she received reading intervention in the first semester of second grade, and by mid-year, she again improved and interventions ceased.

16.     M.C. began attending sessions with a therapist during her second-grade year to address her anxiety and panic attacks related to reading and school and her lack of confidence in those activities and in other areas.

17.     In May 2023, towards the end of second grade, M.C. was diagnosed with attention deficit hyperactivity disorder (ADHD) and began taking medication.

18.     M.C.'s score on the spring 2023 dyslexia screener was in the "at risk" range.

19.     M.C. participated in a WGSD reading program that summer.

20.     Based on fall 2023 assessments, WGSD determined she was not eligible for reading interventions. However, due to ongoing concerns about dyslexia, specifically

4

her inability to spell, at the beginning of the second term, she was placed back in reading interventions to receive phonics support to improve her spelling. She continued to receive reading intervention throughout the school year.

21.     M.C. received math support until February 2024, and although her progress was minimal, she was deemed to have made sufficient progress to end it.

22.     Despite participating in reading interventions for most of the school year, M.C. ended her third-grade year spelling below grade-level expectations and remained "at risk" in spelling.

23.     During the winter of 2024, Parents sought a Section 504 plan for M.C. and requested testing for a specific learning disability in reading and math.

24.     M.C.'s anxiety regarding school continued to rise, and her self-confidence plummeted, according to her psychiatrist and family.

25.     Following the evaluation of M.C., Defendants found that M.C. was not eligible for special education services for a specific learning disability in reading or math, and she was not eligible under the Other Health Impairment category on the basis of her ADHD.

26.     Parents obtained a private evaluation from Learning Consultants, which diagnosed M.C. with specific learning disability in reading/dyslexia and math, as well as generalized anxiety disorder and ADHD-combined type.

27.     Parents provided the private evaluation to Defendants prior to the start of M.C.'s fourth-grade year in the fall of 2024, and they requested the Districts develop a plan before the school year began.

28.     In early September of 2024, the Districts discussed whether there was enough data to suspect a disability and proceed with a second evaluation; they

determined that despite the private evaluation's results, an evaluation by the Districts was not warranted.

29.    Parents filed a due process complaint on September 19, 2024.

30.    Following a hearing, the Administrative Hearing Commission ruled that Plaintiffs had failed to prove any violation of IDEA, and that ruling is the subject of a pending appeal. 4:25-CV-00095-JSD.

### September 17, 2024 to Present

31.    On October 17, 2024, while the prior case was pending before the AHC, Plaintiffs provided Respondents with a ten-day notice of their intent to unilaterally place M.C. at the Churchill School.

32.    Churchill did not have an immediate opening in M.C.'s grade level, so Parents were unable to move her on day eleven after the notice period completed.

33.    At the due process hearing in October and November of 2024, Plaintiffs presented significant testimony, putting the District on notice of the full extent of M.C.'s educational and mental health struggles.

34.    Testimony from M.C.'s private therapist and psychiatrist detailed the link between her mental health concerns and the Districts' refusal to implement supports.

35.    Testimony from M.C.'s tutor, a long-time educator for WGSD who had recently retired, showed M.C.'s below-grade level reading, writing, and math abilities.

36.    On November 4, 2024, Plaintiffs formally requested that SSD conduct a comprehensive educational evaluation.

37.    A Review of Existing Data meeting occurred on December 4, 2024; the team suspected disabilities in fine motor, language, academic achievement, and social-emotional behavior.

38.     Parents consented to additional testing on December 11, 2024.

39.     On December 17, 2024, WGSD agreed to implement a 504 plan.

40.     Parents obtained an Occupational Therapy (OT) evaluation from Come Play STL in January 2025. The evaluator recommended that M.C. receive OT services twice per week for 45-minute sessions to address deficits in visual perceptual skills, ocular motor control, fine motor coordination, reflex integration, executive functioning, sensory processing, and postural control/body awareness.

41.     Come Play also strongly recommended that M.C. complete a Vision Therapy evaluation, engage in the NOW! Program for reading and dyslexia, and continue Play Therapy.

42.     SSD's Occupational Therapist, who was present at the first eligibility meeting, described her evaluations to the team.

43.     Her testing also noted deficits in vertical ocular pursuits, along with M.C.'s difficulties tracking and stabilizing her eyes.

44.     SSD's Occupational Therapist also felt that further evaluation for vision issues was appropriate and expressed concern that M.C.'s visual deficit might impact her reading and other academic areas.

45.     SSD's Occupational Therapist indicated a need for vision therapy, a service SSD does not provide.

46.     M.C.'s WGSD classroom teacher also reported an increase in withdrawal from academic instruction in the fall of 2024, and she noted that M.C. could be self-critical and exhibited anxious behavior related to school performance.

47.     M.C. had communicated stress and sadness in the classroom, and these emotional symptoms resulted in a decrease in work output.

48.     Recognizing that accommodation was needed, her teacher modified her math instruction because of perceived disability.

49.     Despite the curriculum modifications, her teacher reported that M.C. still struggled and expressed her professional opinion that M.C. required special instruction with goals and services in math.

50.     On January 31, 2025, M.C. withdrew from WGSD and enrolled in Churchill Center and School (a school specifically designed to educate students with learning disabilities, particularly dyslexia) when a spot became open in her grade level.

51.     Shortly after starting at Churchill, staff at Churchill noted that M.C. was off-task and distracted by peers; their evaluations determined she was performing below grade-level expectations in reading, writing, and math.

52.     Meanwhile, the Districts finally moved forward with an eligibility meeting. It was held over several dates: February 20, 2025; February 27, 2025; and March 3, 2025.

53.     Mother invited Katie Reed from Learning Consultants to provide further insight and information into her testing.

54.     Bethany Arkills from Come Play STL also attended the meeting to explain the occupational therapy testing and the significance of M.C.'s deficits across multiple areas.

55.     M.C.'s therapist and psychiatrist likewise provided the Districts with additional information.

56.     All four private providers strongly recommended that M.C. be provided an IEP and specialized instruction for her multiple disabilities.

57.     SSD facilitated each meeting and significantly limited input from other team members, placing time limitations on the meetings to accommodate various participants' schedules.

58.     During the meeting on March 3, 2025, Mother informed the team that she needed to return to work and requested that an additional meeting be scheduled to complete the eligibility discussions; Mother had prepared an extensive PowerPoint presentation and had not been able to present all the relevant information from her slides to the team.

59.     However, within minutes of Mother signing out of the Zoom meeting, SSD summarily determined that M.C. was not eligible for special education under any category and refused to hear further from Mother despite Mother's request that her employment be accommodated and that she be fully allowed to participate and contribute information.

60.     At the time of its decision to refuse all services, SSD conducted no new academic or intellectual testing; instead, they utilized data they selected from their prior testing and private evaluations. SSD determined that M.C. did not meet eligibility requirements for a language impairment based on their testing.

61.     SSD determined that M.C. did not meet eligibility requirements for Emotional Disturbance because, although M.C. displayed characteristics of Emotional Disturbance, the traits did not exist to a marked degree within the learning environment (according to SSD).

62.     SSD further determined, without evidentiary basis, that the behaviors at school were related to M.C.'s prospective school change, rather than the WGSD

environment and lack of support provided by Districts. Additionally, SSD determined that the behaviors did not adversely impact her educational performance.

63.     SSD determined that M.C. was not eligible for services on the basis of Other Health Impaired (OHI), concluding that her ADHD diagnosis did not adversely impact her strength, vitality, or alertness. SSD did not consider M.C.'s anxiety diagnosis under the OHI eligibility category.

64.     SSD determined that M.C. was not eligible for services on the basis of a Specific Learning Disability (SLD) in Basic Reading, Reading Fluency, Reading Comprehension, Written Expression, Math Problem Solving, or Math Calculation, even though she met state standards for the discrepancy in several areas, and despite statements from her classroom teacher indicating a need for specialized instruction.

65.     Missouri uses a discrepancy model whereby a student is considered for a specific learning disability if there is a discrepancy between academic achievement and intellectual disability of at least 1.5 standard deviations.

66.     If a student does not demonstrate a discrepancy of at least 1.5 standard deviations, a student may nonetheless be deemed to have a specific learning disability if the evaluation team determines a discrepancy exists based on professional judgment and review of assessments.

67.     According to Defendant SSD's testing, M.C.'s Full-Scale IQ score was 112.

68.     According to the private Learning Consultants testing, M.C.'s Full-Scale IQ score was 109 and her General Ability Index (GAI) score was 113.[1]

---

[1] GAI is a composite score that, according to the publisher of the WISC-IV assessment, provides a "summary score that is less sensitive to the influence of working memory and processing speed." Susan E. Rainford et al., GAI Utility, https://www.pearsonassessments.com/content/dam/school/global/clinical/us/assets/wisc-iv/wisc-iv-gai-utility.pdf. "For some children with learning disabilities, attentional problems, or other

69.     For M.C. to demonstrate the required discrepancy, using her Full-Scale IQ of 112 (per SSD), she would have to score below 90 on relevant academic achievement assessments; using her Full-Scale IQ score of 109 (per Learning Consultants), she would have to score below 87.

70.     M.C. had multiple subtest scores below 90, including Word Attack (82), Oral Reading Fluency (73), two spelling subtests (88), and the Math Fact Fluency subtest (89). She also had two composite scores below 90, including Reading Fluency and Math Calculation, both at 89.

71.     Defendant SSD determined that despite meeting the state-required discrepancy in these areas, M.C. failed to exhibit a "consistent pattern of discrepancy," and some of these skills "are commensurate with her cognitive abilities."

72.     SSD personnel specifically refused to consider professional judgment in the places where M.C. did not meet the discrepancy standard.

73.     SSD also determined that M.C. was adequately achieving for age and grade-level standards, despite significant evidence to the contrary, including statements by her classroom teacher and representatives from Churchill.

74.     The SSD evaluation report stated that M.C.'s classroom teacher reported she was "on track" in all areas and did not require special education services.

75.     In direct contradiction to the evaluation report, M.C.'s WGSD classroom teacher provided a written disagreement with this finding and advocated for M.C. to

---

neuropsychological issues, concomitant working memory and processing speed deficiencies lower the FSIQ. While potentially clinically meaningful, this reduction in the FSIQ may decrease the magnitude of the ability–achievement discrepancy for some children with learning disabilities and make them less likely to be found eligible for special education services in educational systems that do not allow consideration of other methods of eligibility determination." *Id.*

receive special education services in math, both during the meeting and in the subsequent written statement.

76.   All outside professionals working with M.C., along with the educators at Churchill, advocated for her to receive special education services.

77.   All outside professionals indicated that M.C.'s disabilities adversely impacted her education and required special education services; Churchill staff indicated that M.C. was working below grade-level expectations in all areas.

78.   Respondents failed to consider eligibility under the Visual Impairment category and failed to conduct additional testing recommended by both Come Play STL and the SSD occupational therapist.

79.   Parents made every effort to collaborate with the school to have their child's needs met.

80.   They provided an abundance of information from multiple experts who offered their professional opinions indicating that M.C. requires special education services and supports.

81.   They provided information about the level of distress that school caused M.C. daily.

82.   Parents provided information from Churchill which indicated M.C.'s current reading ability was below grade-level.

83.   Churchill also provided samples and information on writing and math to the Districts indicating concerns with grade-level expectations.

84.   SSD disregarded the recommendations and concerns of Parents, outside professionals, their own OT who recommended additional evaluations, and the WGSD

classroom teacher—all of whom recommended that M.C. be found eligible for special education services.

85.    Parents were left with no alternative but to remove their child from WGSD and privately place her at Churchill.

86.    M.C. is currently enrolled at Churchill at the time of this filing.

87.    M.C. has still not been found eligible for special education by SSD or provided an IEP. WGSD has stated its belief that M.C. is eligible; however, only SSD can determine her eligibility and provide her with an IEP.

**Instant Due Process Petition and Decision of AHC**

88.    On June 11, 2025, Plaintiffs filed a due process complaint against Defendant SSD.

89.    SSD moved to join Defendant WGSD as a co-defendant, and the AHC ordered Plaintiffs to amend their complaint and add WGSD as a party despite WGSD's opposition to SSD's joinder motion. As a result, on July 17, 2025, Plaintiffs filed an amended due process petition against both Defendants.

90.    Defendants next moved to dismiss the petition. Defendants moved to dismiss all non-IDEA claims (claims made pursuant to the Fourteenth Amendment of the U.S. Constitution, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act); the AHC dismissed those claims as it lacked authority to decide non-IDEA claims, thereby satisfying exhaustion of those claims (to the extent that it is necessary under the IDEA).

91.    Defendants further moved to dismiss the due process petition under the rule stated in *Thompson by and through Buckanon v. Bd of Spec. Sch. Dist. No. 1 (Minneapolis)*, 144 F.3d 574, 578 (8th Cir. 1998). The *Thompson* case held that if a

13

student changes school districts without first requesting a due process hearing, the student's right to challenge prior educational services is not preserved. 144 F.3d at 579.

92.    Plaintiffs argued that *Thompson* did not apply for several reasons: (1) the facts of *Thompson* were distinguishable; (2) *Thompson* concerned a challenge to previous education, whereas this case concerns a claim for private school reimbursement; (3) the purpose of the *Thompson* rule is to give a school district adequate notice before a student is enrolled in a private school, and Defendants here had ample notice; (4) a majority of courts, as well as the federal agency tasked with responsibility for special education, have found that *Thompson* does not or should not deny a student compensatory services or tuition reimbursement simply because of the timing of a transfer to another school district; (5) the procedural safeguards provided to Parents by the Districts do not adequately inform Parents of the potential consequences of transferring their child to another district before filing a due process petition seeking reimbursement; (6) that due process was in fact pending in the form of a Federal appeal at the time of removal; and (7) the Eighth Circuit has recognized, in *Indep. Sch. Dist. No. 284 v. A.C.*, 258 F.3d 769 (8th Cr. 2001), that removal from the District does not moot a claim to reimbursement for private school placement.

93.    The AHC agreed that *Thompson* was factually distinguishable from the instant case, but nonetheless held: "Courts within the Eighth Circuit have unequivocally held that a due process challenge may not be lodged against a former school district when the student and his or her parent fail to request a due process hearing before the student is withdrawn." *Thomas & Rebecca Chibnall, in the interest of M.C. v. Webster Groves Sch. Dist. and Special Sch. Dist. of St. Louis County*, No. 25-0865, Order (Aug. 19, 2025), at 7 (Order) (citations omitted).

94.    The AHC reasoned that although Plaintiffs, "argue they are not challenging Student's previous education, in order to obtain tuition reimbursement for a unilateral private school placement, they must be able to establish that Student was eligible for services under the IDEA at her former school and that [Defendants] were not providing Student with a FAPE [free appropriate public education]." Order at 8.

95.    Accordingly, the AHC concluded, Plaintiffs, "should have filed a due process complaint challenging the educational services [Defendants] provided before disenrolling Student from WGSD or SSD in January 2025 and placing her in a private school." *Id.*

96.    The AHC also rejected Plaintiffs' argument regarding the procedural safeguards provided to Parents and determined that the "lack of an express warning" of the consequences of removal "does not compel us to conclude that parents retain their right to file a due process claim against the former district after their child unilaterally disenrolls and enrolls in the private school." *Id.*

97.    The AHC found that Plaintiffs' October 17, 2024, letter notifying Districts of their intent to unenroll M.C. from WGSD and SSD ten days hence was not sufficient, because they did not actually remove her from the Districts until approximately three months after the letter. *Id.* at 9-10. The AHC concluded instead that Plaintiffs' notice of their intent to withdraw M.C. "expired 10 business days after October 17, 2024." *Id.*

98.    Acknowledging the widespread disagreement with the *Thompson* decision, the AHC found that it was nonetheless bound by *Thompson* and therefore, because Plaintiffs, "did not file their current due process complaint prior to removing Student from WGSD and SSD," they failed to state a claim upon which relief could be granted. *Id.* at 13.

99.    The AHC dismissed the petition and this appeal follows. The Order is attached to this Complaint as **Exhibit A**.

### COUNT I
### Failure to Provide Free and Appropriate Education
*Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1401 et seq.*
*De Novo Review of Administrative Decision*
(By M.C. as Against All Defendants)

100.    Plaintiffs incorporate and reallege all the foregoing paragraphs in this count.

101.    Student is a child with a disability as defined by the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1401(3)(A).

102.    SSD and WGSD are Local Educational Agencies (LEA) as defined by the IDEA, 20 U.S.C. § 1401(9). Although SSD is tasked with special education services, both districts provide educational services to Student

103.    Defendants failed to provide Student with a free appropriate public education (FAPE), in violation of IDEA and Missouri law, from September 17, 2024 to present.

104.    The Order should be reversed for failure to find that the Districts violated their Child Find obligation, for failure to find that the Districts committed numerous procedural and substantive violations of the IDEA, for failure to find that the Churchill School is an appropriate placement for M.C., for faulty reliance on *Thompson*, and for requiring a new ten day notice without statutory authority

105.    Plaintiffs pray for an order of compensatory education, an Independent Educational Evaluation, reimbursement, costs, and expenses.

## COUNT II
### Disability Discrimination
*Section 504, Rehabilitation Act, 29 U.S.C. § 794 et seq.*
(By M.C. as Against All Defendants)

106. Plaintiffs incorporate and reallege all the foregoing paragraphs in this count.

107. The Districts violated Plaintiffs' rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

108. The Districts also violated different and independent procedural and substantive requirements of Section 504.

109. The IDEA does not provide the exclusive remedy for violations of the educational rights of students with disabilities.

110. Student is an individual with a disability and a student with a disability as defined by the Rehabilitation Act, 29 U.S.C. § 705.

111. SSD and WGSD are local Educational Agencies (LEA) as defined by the IDEA, 20 U.S.C. § 1401(9), that receive federal financial assistance, and therefore constitute a program or activity covered by the Rehabilitation Act, 29 U.S.C. § 794. Although SSD is tasked with special education services, both districts provide educational services to Student

112. Defendants, solely based on Student's disability, excluded her from participation in, denied her the benefits of, and subjected her to discrimination under a program or activity receiving federal financial assistance in violation of 29 U.S.C. § 794(a).

113. Defendants disregarded a strong likelihood that their treatment of M.C. would result in a violation of federally protected rights under Section 504 and thereby

showed deliberate indifference to those rights.

114.    The Districts' actions discriminated against Student on the basis of her disability in violation of Section 504 when they:

   a.    Denied her the opportunity to participate in or benefit from aids, benefits or services it offers others;

   b.    Denied her the opportunity to participate in or benefit from aids, benefits or services that are equal to that afforded to others;

   c.    Provided her aids, benefits or services that are not as effective as those provided to others;

   d.    Unnecessarily provided her with different or separate aids, benefits or services;

   e.    Otherwise limited her in the enjoyment of all the rights, privileges, and advantages and opportunities enjoyed by others receiving their aids, benefits and services;

   f.    Deprived Student of an equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement in the most integrated setting appropriate to her needs;

   g.    Utilized criteria or methods of administration that have the effect of subjecting her to discrimination, or have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the programs or activities; and

   h.    Determined the site or location of services in a manner that has the effect of excluding her, and denying her the benefits of or subjecting her to discrimination under its programs or activities.

        i.      Intentionally withheld relevant educational information from Parents;

        j.      Intentionally omitted testing in areas of suspected disability;

        k.      Retaliated against Plaintiffs as they sought to enforce Student's rights by withholding important educational information, persistently refusing requests for documents, and refusing to utilize data, evaluations and other information to appropriately determine Student's educational needs and services.

115.      As a result of disability discrimination Student was relegated to an inferior education program with fewer services, programs, activities, benefits and other opportunities, and an inferior status in the enjoyment of critical education services, resulting in educational, functional, communication, and social disadvantages in ways that diminish her current and future communication, health, independence, safety, self-esteem, relationships, dignity, productivity, satisfaction and well-being, in a direct affront to the purposes of federal special education and anti-discrimination laws.

116.      As a result of disability discrimination, Student was significantly impeded in making progress towards the goals of equal opportunity, full participation, independent living, and economic self-sufficiency, contrary to the purposes of federal special education and anti-discrimination laws.

117.      As a direct result of disability discrimination, Plaintiffs expended private funds to provide evaluations of Student's disabilities and needs, as well special education and related services in an amount to be established at trial that the Districts should be ordered to pay.

118.      As a result of Defendants' conduct, Plaintiffs suffered injuries and actual damages in an amount to be established at trial that the Districts should be ordered

to pay.

119.    Plaintiffs are entitled to compensatory and emotional distress damages, equitable relief, costs, and attorney's fees.

## COUNT III
### Disability Discrimination
*Americans with Disabilities Act (ADA), 42 U.S.C. 12131 et seq.*
(By M.C. as Against All Defendants)

120.    Plaintiffs incorporate and reallege all the foregoing paragraphs in this count.

121.    The Districts violated Plaintiffs' rights under Title II of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, *et seq.*

122.    The Districts also violated different and independent procedural and substantive requirements of the ADA.

123.    The IDEA does not provide the exclusive remedy for violations of the educational rights of students with disabilities.

124.    Student is a qualified individual with a disability under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131(2); *see also* 42 U.S.C. § 12102(1), (2); 28 C.F.R. § 35.108(b), (c).

125.    SSD and WGSD are public entities within the meaning of the ADA. 42 U.S.C. § 12131(1)(B). Although SSD is tasked with special education services, both districts provide educational services to Student.

126.    Defendants excluded Student from participation in, and denied her the benefits of, the services, programs, or activities of a public entity ,and subjected her to discrimination, in violation of 42 U.S.C. § 12132.

127.    Defendants disregarded a strong likelihood that their treatment of M.C. would result in a violation of federally protected rights under the ADA and thereby showed deliberate indifference to those rights.

128.    The Districts' actions discriminated against Student in violation of 42 U.S.C. §12312 and 28 C.R.R. §35.130 when they:

   a.    Denied Student the opportunity to participate in or benefit from the aid, benefit or service;

   b.    Afforded Student an opportunity to participate in or benefit from the aid, benefit or service that was not equal to that afforded others;

   c.    Provided Student an aid, benefit, or service that was not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

   d.    Provided Student different or separate aids, benefits or services than provided to others and refused to provide modifications necessary to its standard schedule in order to provide her with aids, benefits or services as effective as those provided to others;

   e.    Otherwise limited Student in the enjoyment of a right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit or service;

   f.    Denied Student the opportunity to participate in services, programs, or activities that are not separate or different;

   g.    Utilized criteria or methods of administration that had the effect of subjecting Student to discrimination on the basis of disability, and had the purpose or effect of defeating or substantially impairing accomplishment of the objectives of its program with respect to individuals with disabilities;

21

      h.      Refused to make reasonable modifications to policies, practices or procedures when necessary to avoid discrimination on the basis of disability;

      i.      Imposed or applied eligibility criteria that screen out or tend to screen out an individual or class or individuals with disabilities from fully and equally enjoying any service, program or activity;

      j.      Retaliated against Plaintiffs as they sought to enforce Student's rights by withholding important educational information, persistently refusing requests for documents, and refusing to utilize data, evaluations and other information to appropriately determine Student's educational needs and services; and

      k.      Failed to have adequate policies, procedures, protocols, training and oversight so as to ensure Student was not subject to discrimination.

129.      As a result of disability discrimination, Student has been relegated to an inferior education program with fewer services, programs, activities, benefits and other opportunities, and an inferior status in the enjoyment of critical education services, resulting in educational, functional, communication, and social disadvantages in ways that diminish her current and future communication, health, independence, safety, self-esteem, relationships, dignity, productivity, satisfaction and well-being, in a direct affront to the purposes of federal special education and anti-discrimination laws.

130.      As a result of disability discrimination, Student has been significantly impeded in making progress towards the goals of equal opportunity, full participation, independent living, and economic self-sufficiency, contrary to the purposes of federal special education and anti-discrimination laws.

131.      As a direct result of disability discrimination, Plaintiffs spent private

funds to provide evaluations of Student's disabilities and needs, as well as special education and related services, in an amount to be established at trial, that the District should be ordered to pay.

132.    As a direct result of disability discrimination, Student has suffered injuries and damages in an amount to be established at trial that the District should be ordered to pay.

133.    As a result of Defendants' conduct, Plaintiffs are entitled to compensatory and emotional distress damages, injunctive relief, costs, and attorney's fees.

**COUNT IV**
**Disability Discrimination**
*Section 504, Rehabilitation Act, 29 U.S.C. § 794 et seq.*
(By Thomas and Rebecca Chibnall as Against All Defendants)

134.    Plaintiffs incorporate and reallege all the foregoing paragraphs in this count.

135.    The Districts violated Plaintiffs' rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

136.    The District also violated different and independent procedural and substantive requirements of Section 504.

137.    The IDEA does not provide the exclusive remedy for violations of the educational rights of students with disabilities.

138.    Student is an individual with a disability and a student with a disability as defined by the Rehabilitation Act, 29 U.S.C. § 705. The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 are "available to any person aggrieved

by any act or failure to act by any recipient of Federal assistance" under 29 U.S.C. § 794. 29 U.S.C. § 794a(a)(2). Parents are such aggrieved persons.

139.    SSD and WGSD are local Educational Agencies (LEA) as defined by the IDEA, 20 U.S.C. § 1401(9), that receive federal financial assistance, and therefore constitute a program or activity covered by the Rehabilitation Act, 29 U.S.C. § 794. Although SSD is tasked with special education services, both districts provide educational services to Student.

140.    Defendants, solely on the basis of Student's disability, excluded her from participation in, denied her the benefits of, and subjected her to discrimination under a program or activity receiving federal financial assistance, in violation of 29 U.S.C. § 794(a). Further, Parents were themselves denied meaningful participation as parents in Student's education, procedural safeguards and due process, all on the basis of Student's disabilities.

141.    Defendants disregarded a strong likelihood that their treatment of M.C. would result in a violation of federally protected rights under Section 504 and thereby showed deliberate indifference to those rights.

142.    As a result of Defendants' discriminatory actions against M.C. and Parents' association with M.C., Parents have incurred injuries and damages including, but not limited to, significant expenses incurred in obtaining private services to address Student's educational needs as well as attorney's fees.

143.    Plaintiffs are entitled to compensatory and emotional distress damages, equitable relief, costs, and attorney's fees.

<u>**COUNT V**</u>
**Disability Discrimination**
*Americans with Disabilities Act (ADA), 42 U.S.C. 12131 et seq.*
(By Thomas and Rebecca Chibnall as Against All Defendants)

144.    Plaintiffs incorporate and reallege all the foregoing paragraphs in this count.

145.    The Districts violated Plaintiffs' rights under Title II of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, *et seq*.

146.    The Districts also violated different and independent procedural and substantive requirements of the ADA.

147.    The IDEA does not provide the exclusive remedy for violations of the educational rights of students with disabilities.

148.    Student is a qualified individual with a disability under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131(2); *see also* 42 U.S.C. § 12102(1), (2); 28 C.F.R. § 35.108(b), (c).

149.    Parents are qualified individuals under the Americans with Disabilities Act, 42 U.S.C. § 12112(b)(4), due to their association and relationship with Student

150.    SSD and WGSD are public entities within the meaning of the ADA. 42 U.S.C. § 12131(1)(B). Although SSD is tasked with special education services, both districts provide educational services to Student.

151.    Defendants excluded Student from participation in and denied her the benefits of the services, programs, or activities of a public entity and subjected her to discrimination, in violation of 42 U.S.C. § 12132.

152.    Defendants disregarded a strong likelihood that their treatment of M.C. would result in a violation of federally protected rights under the ADA and thereby

showed deliberate indifference to those rights. Defendants discriminated against Parents Thomas and Rebecca Chibnall, in that Parents have a relationship or association with Student *See* 42 U.S.C. § 12112(b)(4) (discrimination includes excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association); 28 C.F.R. § 35.150(g) (public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.).

153.    As a result of Defendants' discriminatory actions against M.C. and Parents' association with M.C., Parents have suffered injuries and damages including, but not limited to, significant expenses incurred in obtaining private services to address Student's educational needs as well as attorney's fees.

154.    Plaintiffs are entitled to compensatory and emotional distress damages, equitable relief, costs, and attorney's fees.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request the following relief:

1.    The Court find that the Districts violated the Child Find provisions of IDEA;

2.    The Court find that the Districts committed numerous procedural and substantive violations of the IDEA;

3.    The Court find that the Districts failed to provide a Free and Appropriate Public Education under the IDEA from September 17, 2024 to the present;

4.    The Court reverse the Order of the Administrative Hearing Commission

attached as Exhibit A;

5.    The Court order reimbursement to Parents for the costs and expenses of private tutoring and tuition;

6.    General, specific, economic, emotional distress, pain and suffering, and compensatory damages;

7.    Costs, expenses, and reasonable attorneys' fees;

8.    Pre- and post-judgement interest;

9.    Declaratory and injunctive relief; and

10.    Such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: October 3, 2025                Respectfully submitted,

By: /s/ Diane Dragan
Diane Dragan #MO73591
DRAGAN LAW FIRM, LLC
10805 Sunset Office Drive Ste 210
St. Louis, MO 63127
Diane@Draganlawfirm.com
Ph: (314) 788-7323

Attorney for Plaintiffs

EXHIBIT A



# ADMINISTRATIVE HEARING COMMISSION OF MISSOURI

THOMAS & REBECCA CHIBNALL,
in the interest of M.C.,

          Petitioner,

    v.

WEBSTER GROVES SCHOOL DISTRICT
AND SPECIAL SCHOOL DISTRICT OF
ST. LOUIS COUNTY,

          Respondents.

)
)
)
)
)
)
)
)
)
)
)
)

No. 25-0865

## ORDER

We dismiss the due process complaint filed on July 17, 2025, by Thomas and Rebecca

Chibnall (Petitioners) on behalf of their minor child M.C. (Student).

## Procedural Facts

On June 11, 2025, Petitioners filed a due process complaint against Special School

District of St. Louis County (SSD). On July 8, 2025, we granted SSD's motion to join Webster

Groves School District (WGSD) as a necessary party. On July 17, 2025, Petitioners filed an

amended due process complaint against SSD and WGSD (together referred to as Respondents).

On July 28, 2025, Respondents filed a joint motion to dismiss the complaint. Also on July 28,

2025, WGSD filed its response to the amended complaint and its motion for decision on the

pleadings. On August 11, 2025, Petitioners and SSD filed a response to Webster Groves'

motion for decision on the pleadings. Also on August 11, 2025, Petitioners filed a response to

Respondents' joint motion to dismiss the amended complaint.

We may grant a motion for involuntary dismissal if we lack statutory authority to hear a case. 1 CSR 15-3.436(1)(A). We may grant the motion based on a preponderance of admissible evidence, including "an allegation in the complaint, stipulation, discovery response of the petitioner, affidavit, or other evidence admissible under the law." 1 CSR 15-3.436(3).

### Findings of Fact for the Purposes of this Order

1.      Student is a 9-year-old girl who is a rising fifth grade student at Churchill Center and School (Churchill). Student began attending Churchill in January 2025.

2.      Student's former school district is WGSD.

3.      On September 19, 2024, Petitioners filed a due process complaint alleging Respondents had violated the Individuals with Disabilities Education Act (IDEA) by failing to evaluate and find Student eligible for special education and requested reimbursement for private placement and tutoring with a specific reading plan implemented into an Individualized Education Plan (IEP) while she was a student at WGSD (Chibnall I).  A Commissioner of the Administrative Hearing Commission (AHC) conducted a hearing on the due process complaint in October and November of 2024.

4.      On October 17, 2024, while Chibnall I was pending before the AHC, Petitioners, through counsel, provided Respondents with a ten-day notice of their intent to unilaterally place Student at Churchill. Churchill did not have an opening in Student's grade level at that time, so Petitioners did not disenroll her from WGSD at the conclusion of the ten-day notice period. Student continued to be enrolled at WGSD.

5.      On November 4, 2024, Petitioners formally requested that SSD conduct a comprehensive educational evaluation of Student.

6.      On November 22, 2024, the Joint Review Committee agreed to proceed with the evaluation.

7.      On December 4, 2024, a Review of Existing Data meeting occurred.

8.      On December 11, 2024, Petitioners consented to additional testing.

9.      Also on December 11, 2024, the AHC issued its decision in Chibnall I finding that Petitioners failed to carry their burden of proving Respondents had violated the IDEA. See *Thomas & Rebecca Chibnall, in the interest of M.C. v. Webster Groves School District & Special School District of St. Louis County*, Case No. 24-1208 (Dec. 11, 2024). An appeal of that decision is now pending in the United States District Court for the Eastern District of Missouri in Case No. 4:25-cv-00095-JSD.

10.      In December 2024, WGSD agreed to implement a 504 plan for Student to establish accommodations that would be available to Student separate from the IDEA process. SSD also conducted an IDEA evaluation of Student. Student's Individual Education Plan (IEP) team met multiple times to review evaluation data gathered from additional assessments and observations as well as information from other sources, including Student's parent, Student's WGSD 4th grade classroom teacher, and Churchill staff. The IEP team ultimately concluded that Student was not eligible for special education services based on criteria established by the State of Missouri. However, Student's WGSD 4th grade classroom teacher disagreed with the conclusion that Student was ineligible for services and, as required by the State Plan, provided a separate written statement expressing that Student should have been found eligible for specialized instruction in math due to her difficulties with attention, anxiety, and visual tracking. (Amended Complaint pp. 9-12; Amended Response p. 5)

11.      On January 31, 2025, prior to filing their current due process complaint, Petitioners disenrolled Student from WGSD and enrolled her in Churchill.

## Analysis

Petitioners allege Respondents violated the IDEA by failing to identify Student as a child with a disability and now seek reimbursement for private school tuition for that alleged failure. In addition to their IDEA claims, Petitioners allege violations under the Fourteenth

Amendment to the United States Constitution, Section 504 of the Rehabilitation Act of 1973

(Section 504),[1] and Title II of the Americans with Disabilities Act. (ADA).[2]

Respondents request that we dismiss all claims not within the scope of the IDEA.

This Commission is "an adjunct executive agency," not a court vested with judicial

power. *Cass Cnty v. Director of Revenue*, 550 S.W.3d 70, 74 (Mo. banc 2018), quoting *State*

*Tax Comm'n v. Admin. Hearing Comm'n*, 641 S.W.2d 69, 75-76 (Mo. banc 1982). We are not

constitutionally vested with subject matter jurisdiction, which is reserved for the courts of this

state; rather, we are conferred with statutory authority to take certain actions. *Cass Cnty*, 550

S.W.3d at 74, citing *J.C.W. ex rel. Webb v. Wyciskalla*, 275 S.W.3d 249, 254 (Mo. banc 2009).

The statutes empower us to hear due process claims related to the "identification,

evaluation, educational placement, or the provision of a free appropriate public education of the

child." Section 162.961.1, RSMo 2016. Because we have no authority to decide constitutional

issues[3] or to hear claims brought under federal statutes other than the IDEA, we grant

Respondents' request and dismiss Petitioners' constitutional claims and those brought under the

ADA and Section 504.

*Collateral Estoppel and Res Judicata*

Respondents argue that Petitioners' current due process complaint is barred by the

doctrines of collateral estoppel and *res judicata*. Additionally, they argue that some of the

allegations advanced by Petitioners fall outside the IDEA's statute of limitations. Petitioners

counter-argue that they seek to litigate only new claims arising after they filed their first due

process complaint on September 19, 2024, so these doctrines do not apply.

The doctrine of *res judicata* operates to bar any claim that was previously litigated

between the same parties or those in privity with them. *Res judicata* is applicable upon "the

---

[1] 29 U.S.C. Section 794(a).
[2] 42 U.S.C. Section 12131-12165.
[3] *See State Tax Comm'n*, 641 S.W.2d at 75-76; *Cocktail Fortune, Inc. v. Supervisor of Liquor Control*, 994 S.W.2d 955, 957 (Mo. banc 1999).

concurrence of four elements: (1) identity of the thing sued for; (2) identity of the cause of action; (3) identity of the persons or parties to the action; and (4) identity of the quality or status of the person for or against whom the claim is made." *Spath v. Norris*, 281 S.W.3d 346, 350 (Mo. App. W.D. 2009). Collateral estoppel, or issue preclusion, bars re-litigation of issues that were necessarily and unambiguously decided in a prior proceeding. *Id.* Unlike *res judicata*, collateral estoppel applies to issues that are being re-litigated even though the prior lawsuit raised a different cause of action. *Id.* Collateral estoppel does not require the identity of claims and may be asserted by strangers to the original action. *Id.* In determining whether collateral estoppel applies, courts must consider whether: (1) the issue decided in the prior case was identical to that in the present action; (2) the prior suit resulted in a final judgment on the merits; (3) the party against whom the doctrine is asserted participated as a party or in privity with a party to the prior adjudication; and (4) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue. *Id.*

Petitioners' current due process complaint appears to rest heavily on facts arising prior to September 17, 2024, which were extensively adjudicated in our prior decision, *Chibnall I.* The claims and issues arising specifically from the earlier case are clearly barred by both doctrines. Regarding *res judicata*, Petitioners challenged Respondents' alleged failure to evaluate and find Student eligible for special education and sought reimbursement for private services. Regarding collateral estoppel, the issues decided based upon events that occurred before September 17, 2024, are identical in both the *Chibnall I* complaint and the current due process complaint, and Petitioners had a full and fair opportunity to litigate them.

However, neither doctrine precludes Petitioner from bringing new claims based upon facts arising *after* September 17, 2024. Petitioner's current due process complaint does allege specific facts arising after September 17, 2024, which presumably form the bases for their current claims. These claims are that Respondents failed to evaluate Student, identify Student as

a child with a disability, develop a proper IEP, follow procedural safeguards, and generally provide Student a FAPE.

While Petitioners cannot re-litigate old claims and issues, these new facts create a different issue. The IDEA's "child-find obligation" is ongoing and independent of whether a parent requests an evaluation. *Independent Sch. Dist.*, 123 F. Supp. 3d 1100, 1108 (D. Minn. 2015), quoting 20 U.S.C. Section 1414(a)(1)(A). Although, Petitioners have alleged comparatively scant facts arising after September 17, 2024, whether those facts suggest a child-find violation represents a separate issue for us to consider, and Petitioners have not yet had an opportunity to litigate those facts. Therefore, we find that Petitioners' current complaint is not categorically barred by *res judicata* or collateral estoppel and that they may proceed on claims arising after September 17, 2024.[4]

*The Thompson Rule*

Respondents next argue that Petitioners' current due process complaint is barred by the "*Thompson* rule." Under the *Thompson* rule, a petitioner who fails to file a due process claim before removing his or her child from a school district cannot state a cause of action under the IDEA against that district. *Thompson by & through Buckhanon v. Bd. of Special Sch. Dist. No. 1 (Minneapolis)*, 144 F.3d 574, 578 (8th Cir. 1998). "If a student changes school districts and does not request a due process hearing, his or her right to challenge prior educational services is not preserved." *Thompson*, 144 F.3d at 579. "Subsequent challenges to the student's previous education become moot because the new school district is responsible for providing a due process hearing." *Id*. The *Thompson* court noted:

> Contrary to [the parent's] assertions, her need to preserve the right to challenge [the student's] prior educational services is not simply a procedural barrier. The purpose of requesting a due process hearing is to challenge an aspect of a child's education and to put the school district on

---

[4] We agree the IDEA's two-year statute of limitations applies to this case. *See* 34 C.F.R. Section 300.511(e) and (f). Because we find Petitioners' claims from outside this period are also barred by *res judicata*, we need not discuss the statute of limitations any further.

notice of a perceived problem. Once the school district receives notice, it
has the opportunity to address the alleged problem[.]

*Id.* "Recovering tuition [or costs] is a remedy only if the free and appropriate public education

(FAPE) guarantee has been violated, exhaustive administrative remedies have been tried before

placement, and the school has been notified." *Thompson*, 144 F.3d at 579.

Petitioners contend that the *Thompson* rule does not apply in this case. They argue: (1)

*Thompson* was decided on distinguishable facts; (2) unlike *Thompson*, the instant case does not

challenge Student's previous education but asserts a claim for private school tuition

reimbursement; (3) *Thompson* is based on the idea that a school district is entitled to notice

before a student is unilaterally enrolled in a private school, and Respondents in this case had

adequate notice of Petitioners' dissatisfaction; (4) most courts outside the Eighth Circuit and

the Office of Special Education Programs (OSEP) reject the *Thompson* ruling; (5) removal from

a school district to a private placement does not moot a claim for reimbursement because there

is "no new school district" responsible for providing the student with a FAPE; Pet's Resp. at 5;

and (6) neither the Missouri procedural safeguards nor the State Plan informs parents that they

will lose their IDEA claims against a district if they remove a student without first filing a due

process complaint. We find none of these arguments would support a decision that disregards

the clear directives of *Thompson* and its progeny.

In *Thompson*, a Minnesota state law required parents to file a due process complaint

against the original school district before transferring the student to a charter school, and the

charter school to which the student transferred was considered a separate school district. *Id.* at

578-79. In this respect, *Thompson* is factually distinguishable from the instant case. However,

since *Thompson* was decided, courts within the Eighth Circuit have unequivocally held that a

due process challenge may not be lodged against a former school district when the student and

his or her parent fail to request a due process hearing before the student is withdrawn. *See, e.g.,*

*C.N. & J.N. v. Willmar Pub. Sch., Indep. Sch. Dist. No. 347*, 591 F.3d 624, 631, n 6 (8th Cir.

2010) (holding parent's claim failed because it was filed after student left the school district that allegedly denied her a FAPE); *M.P. ex rel. K.P. v. Indep. School Dist. No. 721*, 326 F.3d 975, 980 (8th Cir. 2003) (holding parents' claim failed because they did not "exhaust [their] administrative remedies by requesting a due process hearing while [the student] was still enrolled in that school district."); *Smith ex rel. Townsend v. Special Sch. Dist. No. 1,* 184 F.3d 764, 768 (8th Cir. 1999) (holding dismissal of plaintiff's two IDEA claims, each filed after he left the school district, were proper); *I.E.C. v. Minneapolis Pub. Schs., Special Sch. Dist. No. 1*, 34 F. Supp. 3d 1006, 1016 (D. Minn. 2014) ("[I] t is well-established [ ] that, when parties have notice of their procedural safeguards, 'any claims brought on behalf of students who had left the school and attended another school district without first requesting a due process hearing for alleged violations of the IDEA have become moot.'" (internal citation omitted)); *D. L. by Landon v. St. Louis City Sch. Dist*., 950 F.3d 1057, 1063 (8th Cir. 2020) (citing *Thompson*, 144 F.3d at 579) ("The right to challenge prior educational services is forfeited when a student changes school districts prior to requesting a due process hearing.").

Although Petitioners argue they are not challenging Student's previous education, in order to obtain tuition reimbursement for a unilateral private school placement, they must be able to establish that Student was eligible for services under the IDEA at her former school and that Respondents were not providing Student with a FAPE. *See* 34 C.F.R Section 300.148(c) (setting forth the standard by which a parent of a disabled child can demonstrate entitlement to reimbursement for a private placement). Accordingly, Petitioners should have filed a due process complaint challenging the educational services Respondents provided before disenrolling Student from WGSD or SSD in January 2025 and placing her in a private school. Furthermore, pursuant to the State Plan, the annual procedural safeguards notice provided to parents of eligible students explains parents' "opportunity to present and resolve complaints through due process complaint and state complaint procedures including the time period in

8

which to file[.]" Regulation V, Section D at 66. While the procedural safeguards notice and the State Plan may not expressly warn parents that they will lose their opportunity to bring an IDEA claim against the former district if they disenroll the student from the district and place the student in a private school, the lack of an express warning does not compel us to conclude that parents retain their right to file a due process claim against the former district after their child unilaterally disenrolls and enrolls in the private school.

Finally, under *Thompson*, a parent's unilateral removal of a student from his or her former district before filing a due process claim subverts the purpose of the IDEA by depriving the former school district of notice and the opportunity to resolve an educational dispute. *Thompson*, 144 F.3d at 578. Courts following the *Thompson* rule have "found lack of notice when no formal due process complaint was filed, even though the district was aware that the parent/guardian was dissatisfied with the education provided." *A.H. by and Through D'avis v. Indep. Sch. Dist.,* 466 S.W.3d 17, 29 fn.7 (Mo. App. W.D. 2015) *see also M.P.*, 326 F.3d at 977-81; and *C.N.*, 591 F.3d at 627-32.

Petitioners claim they have satisfied the purpose of *Thompson* by providing Respondents "notice of an opportunity to address a perceived problem[.]"[5] As evidence, Petitioners cite a letter dated October 17, 2024, they sent to Respondents, which stated, in relevant part:

> [Petitioners are] hereby providing notice that ten business days after the delivery of this letter, the family intends to enroll [Student] in Churchill, a private school in St. Louis or a similar private school to address her learning disabilities. We will then seek reimbursement from the district through the pending Due Process Petition.

Petitioners' Response in Opposition to Motion to Dismiss and Request for Attorney Fees, Ex. A

Based on the October 17, 2024, letter, Petitioners argue it would be "farcical" to find Respondents did not have notice for the purposes of *Thompson*.[6] On the contrary, we find

---

[5] Petitioners' Resp. to Mot. to Dismiss, p. 10.
[6] *Id*.

Petitioners' argument ignores several facts that obviate the effect of their alleged "notice." Petitioners sent this notice on October 17, 2024, and stated their intent to remove Student from WGSD "ten business days after the delivery of this letter[.]"[7] However, Petitioners did not remove Student from WGSD until the end of January of 2025, approximately three months after the date of their letter. After the 10 business days had passed, Petitioners and Respondents agreed to conduct a comprehensive evaluation, held a review of existing data, performed additional testing, fully litigated the due process complaint that was pending at that time, and agreed to a 504 plan. We find that, under these facts, Petitioners' notice of their intent to withdraw Student expired 10 business days after October 17, 2024. Petitioners did not provide Respondents with a notice that Petitioners would withdraw Student on January 31, 2025.

Petitioners argue that we should decline to follow *Thompson* because courts outside the Eighth Circuit have rejected its holding or have awarded tuition reimbursement in similar circumstances. We acknowledge that some courts and the OSEP may choose to not follow the *Thompson* decision, with the exception of the *Endrew F.* case. As an adjunct executive agency, we are bound by state court decisions, including *D'Avis*, in which the court held, "Because the Eighth Circuit . . . has an obvious geographic connection with Missouri, we find its interpretation of federal law highly persuasive." 466 S.W.3d at 23. This Commission similarly looks to the Eighth Circuit for guidance.

Regarding *Endrew F.*, Petitioners contend that, "At no point from the initial filing to the final Supreme Court decision was it ever suggested that Endrew lost his right to compensatory services and private school tuition reimbursement for failing to file a complaint prior to leaving the district."[8] We agree with Petitioner that the Court did not hold Endrew's parents were barred from recovering tuition by the *Thompson* rule. However, that question was not the subject of the

---

[7] Petitioners attached a copy of their notice to their response to Respondents' motion to dismiss the original complaint filed on July 3, 2025.

[8] Pet's Resp. at 17.

appeal; the sole issue before the Court was whether the school district provided Endrew with a FAPE. *Endrew F. ex rel. Joseph F. v. Douglas Cnty Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017). We cannot conclude that the Court intended to overturn *Thompson* when it expressed no opinion concerning the rule. *See D'Avis*, 466 S.W.3d at 24-25 ("The Court does not address issues that 'fall[ ] outside the question on which [it] granted certiorari.'" (internal citation omitted.)). In short, *Endrew F.* does not support Petitioners' contention that the *Thompson* rule does not apply in this case.

Petitioners cite several cases within the Eighth Circuit in an attempt to support their argument that the *Thompson* rule does not apply to private school placements. None of those cases support that position.

Petitioners cite *Indep. Sch. Dist. No. 284 v. A.C.*, 258 F.3d 769 (8th Cr. 2001), for the proposition that "removal from the District does not moot a claim to reimbursement for private school placement." Pet's Resp. at 8-9. In *A.C.,* the student left the district sometime *after* her due process claim was heard and decided but while an appeal in the case was still pending; the district asserted that her claim should be dismissed as moot. As support for their argument, Petitioners point to the court's statement that, "If A.C. or her mother had paid the costs of a private placement at the time, and then sued the District for reimbursement, the claim would not be moot." *Indep. Sch. Dist. No. 284 v. A.C.*, 258 F.3d at 774-75.

*A.C.* does not support Petitioners' position in this case because it did not concern a student who filed a due process complaint after voluntarily leaving the District. The Eighth Circuit recognized this and rejected an argument similar to Petitioners' argument in *M.P.*, stating:

> We do not see how the holding in *A.C.* can assist M.P. under the current circumstances. Whereas A.C.'s mother requested and received a due process hearing before removing her daughter from the delinquent school district, and had therefore preserved a record of the district's deficiencies for future litigation, M.P.'s parents failed to do so. We cannot provide relief under such circumstances.

326 F.3d at 981.

In *Burr v. Ambach*, after their son's school closed, parents filed a due process claim appealing the decision by the New York Institute for the Education of the Blind to deny their son admission. However, the case is inapposite; the claim was not filed against the student's former school district but against the New York State Commissioner of Education, who was at all times the entity responsible for providing the student's placement. 863 F.2d 1071, 1073 (2d Cir. 1988), *vacated by Sobol v. Burr,* 109 S. Ct. 3209 (1989) and *reaff'd by Burr v. Sobol*, 888 F.2d 258, 259 (2d Cir. 1989).

Finally, in *Meiner by and through Meiner v. Missouri*, the parent brought a claim against the school district for wrongfully denying the student special education services, seeking compensatory education for the years the district denied her a FAPE. 800 F.2d 749, 751 (8th Cir. 1986). The district court explained that the issue in *Thompson* was distinguishable from that in *Meiner*, stating, "[t]he claim for which Thompson seeks a hearing is not a challenge to a current IEP or education program as in *Burlington* and *Meiner*. Thompson's claim is that a school district formerly responsible for his education violated its obligations under the IDEA to provide him with FAPE and therefore owes him a remedy." *Thompson by and through Buchanon v. Bd. of Special Sch. Dist. No. 1*, 936 F. Supp. 644, 647 (D. Minn. 1996), *aff'd Thompson*, 144 F.3d 574.

Furthermore, the court in *I.E.C. v. Minneapolis Pub. Sch., Special Sch. Dist. No. 1*, not cited by Petitioners, followed the *Thompson* rule when it barred a claim for private school tuition reimbursement based on the parents' failure to file a due process complaint prior to leaving the district. 34 F. Supp. 3d 1006, 1015 (D. Minn. 2014). The plaintiffs in *I.E.C.* seeking private school tuition reimbursement likewise argued that *Thompson* was wrongly decided "because it does not comport with the purpose of the IDEA." *Id*. at 1015-16. The court held that it was bound by *Thompson* and that the holding applied squarely to the facts before it. *Id*. at

12

1016. As the *D'Avis* court concluded, "[C]ourts have continued to hold that parents who unilaterally enroll their child in private school before filing a due process complaint 'cannot [later] attempt to exhaust their administrative remedies,' regardless of whether the claim is for reimbursement, compensatory education, or both." 466 S.W.3d at 26 (internal citations omitted).

We find Petitioners' arguments unpersuasive. *Thompson* and its progeny require parents to file a due process complaint prior to disenrolling a student from his or her school district in order to preserve their grounds for challenging the original school district's action or inaction under the IDEA.

Because Petitioners did not file their current due process complaint prior to removing Student from WGSD and SSD, Petitioners may not seek reimbursement for the private school tuition they paid or will pay as a result of the January 2025 disenrollment. Accordingly, because their complaint fails to state a claim for which we may grant relief, we dismiss Petitioners' complaint. We deny WGSD's motion for a decision on the pleadings as moot.

### Summary

We grant Respondents' motion and dismiss this case.

SO ORDERED on August 19, 2025.


AMY S. WESTERMANN
Commissioner

**Appeal Procedure**

Please take notice that this is a final decision of the Administrative Hearing Commission and you have a right to request review of this decision. Per Section 162.962 of the Revised Statutes of Missouri, when a review of this decision is sought, either party may appeal as follows:

    (1)  The court shall hear the case without a jury and shall:

        (a)  Receive the records of the administrative proceedings;

        (b)  Hear additional evidence at the request of a party; and

        (c)  Grant the relief that the court determines to be appropriate, basing its decision on the preponderance of the evidence.

    (2)  Appeals may be taken from the judgment of the court as in other civil cases.

    (3)  Judicial review of the Administrative Hearing Commission's decision may be instituted by filing a petition in a state or federal court of competent jurisdiction. Appeals to state court shall be filed within 45 days after the receipt of the notice of the agency's final decision.

    (4)  Except when provided otherwise within this chapter or Part 300 of Title 34 of the Code of Federal Regulations, the provisions of chapter 536 are applicable to special education due process hearings and appeal of same.

    (5)  When a commissioner renders a final decision, such decision shall not be amended or modified by the commissioner or administrative hearing commission.

The right to appeal is also addressed in 34 C.F.R. Section 300.516.